**GTE CORPORATION, Plaintiff,**

v.

**David R. WILLIAMS, individually and dba General Telephone, Defendant.**

**Civ. No. C82–1237G.**

United States District Court, D. Utah C.D.

June 30, 1986.

Jeffrey A. Schwab, Mark Regan, Robert R. Mallinckrodt, Salt Lake City, Utah, for plaintiff.

Robert S. Campbell, Jr., Louise Knauer, Salt Lake City, Utah, for defendant.

## MEMORANDUM DECISION

J. THOMAS GREENE, District Judge.

This matter came on regularly for non-jury trial on April 7, 1986 and concluded on April 17, 1986. Plaintiff GTE Corporation was represented by Jeffrey A. Schwab, Mark Regan and Robert R. Mallinckrodt and defendant Williams was represented by Robert S. Campbell, Jr. and Louise Knauer. After trial of the merits and counsels' able arguments to the Court, the Court took the matter under advisement. The Court, having adopted Findings of Fact and Conclusions of Law, hereby supplements the Findings and Conclusions with a Memorandum Decision which further addresses the factual and legal basis for its decision. The Court does not reiterate all its Findings of Fact but incorporates them by reference herein.

## NATURE OF THE ACTION

Plaintiff GTE Corporation (hereinafter "plaintiff" or "GTE") alleges that defendant Williams dba General Telephone (hereinafter "defendant" or "Williams") infringed GTE's statutory rights in the tradename and trademark [1] "General Telephone" be-

---

**1.** The terms "trademark," "service mark" and "tradename" should not be confused. A "trademark" identifies goods while a "service mark" identifies services. A "tradename" is "the name or title adopted and used by a particular organization engaged in commerce." *Caesars World, Inc. v. Caesar's Palace,* 490 F.Supp. 818, 822 (D.N.J.1980).

"'A trademark is a distinctive mark, symbol, or emblem used by a producer or manufacturer to identify and distinguish his goods from those of others.' *Educational Dev. Corp. v. Economy Co.,* 562 F.2d 26, 28 (10th Cir.1977). 'The strength or distinctiveness of a mark determines both the ease with which it may be established as a valid trademark and the degree of protectiveness it will be accorded.' *McGregor-Doniger,*

ginning in 1974 to the present. Plaintiff specifically alleges four statutory causes of action. First, plaintiff alleges trademark infringement pursuant to Section 32(1)(a) of the Lanham Act of 1946, 15 U.S.C. § 1114(1)(a). That statute makes it a violation for a person to use a registered trademark, without the consent of the registrant, "in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *Id.* Plaintiff's second cause of action alleges a violation of Section 32(1)(b) of the Lanham Act of 1946, 15 U.S.C. § 1114(1)(b). That Section proscribes a person's reproduction, counterfeit, copy, or colorable imitation of a registered trademark, without the consent of the registrant, where such use is applied to "labels, signs, prints, packages, wrappers, receptacles or advertisements intended to be used in commerce upon or in connection with the sale, offering for sale, distribution, or advertising of goods or services on or in connection with which such use is likely to cause confusion, or to cause mistake, or to deceive." *Id.* GTE's third claim alleges unfair competition in violation of Section 43(a) of the Lanham Act of 1946, 15 U.S.C. § 1125(a). That section applies to designations of origin, whether registered or not, and prohibits the use of words or symbols that tend falsely to describe or represent the source or origin of goods or services in commerce. *Id.* Plaintiff's final statutory claim is for damages pursuant to Section 35 of the Lanham Act of 1946, 15 U.S.C. § 1117. That statute allows a plaintiff to recover actual damages, damages in the form of defendant's profits, and attorney's fees,[2] for violation of a right of the registrant of a mark registered in the Patent and Trademark Office (hereinafter "PTO"). Plaintiff's claims are not in the alternative but allege separate violations.

Defendant asserts several affirmative defenses and makes several counterclaims. Generally, those defenses and counterclaims assert that Williams' adoption of the trademark "General Telephone" was in good faith, that Williams is the senior user in Utah and has acquired a common law trademark to the exclusion of GTE's use, that Williams' use in the Wasatch Front region constitutes a remote usage of the trademark which does not infringe on any rights GTE may have elsewhere in the trademark, that GTE abandoned the trademark and thus is the junior user, that GTE is estopped from asserting its claim because it acquiesced in Williams' use and because of laches, that GTE improperly and fraudulently obtained the federal registration, and that Williams is entitled to use the trademark exclusively in the Wasatch Front area of Utah while GTE has concurrent use of its elsewhere, pursuant to 15 U.S.C. § 1052.[3] Defendant's affirmative defenses and counterclaims generally appear to be pleaded in the alternative but some of them overlap, so that one claim or defense may support a finding as to others.

*Inc. v. Drizzle, Inc.,* 599 F.2d 1126, 1131 (2d Cir.1979). Trademark strength is measured by 'its tendency to identify the goods sold under the mark as emanating from a particular, although possibly anonymous source.' *Id." Beer Nuts, Inc. v. Clover Club Foods Co.,* 711 F.2d 934, 939 (10th Cir.1983).

The terms as discussed above have been used interchangeably by the parties. For purposes of this opinion the Court will use only the term "trademark" to characterize the claimed right or rights of the parties.

2. Section 1117 allows recovery of attorney's fees to the prevailing party in "exceptional cases." 15 U.S.C. § 1117.

3. Section 1052(d) allows the concurrent registration and use of the same or similar trademarks in commerce where a court of competent jurisdiction determines that such use is appropriate or where "confusion, mistake or deception is not likely to result from the continued use by more than one person of the same or similar marks under conditions and limitations as to the mode or place of use of the marks or the goods in connection with which the marks are used," provided they become "entitled to use such marks as a result of the concurrent lawful use in commerce prior to ... the date[] of any registration under" the Act. As will be discussed, case law in this area has developed such that this Court is not without guidance in making such a determination.

APPLICABLE LEGAL PRINCIPLES

A. *Federal Registration*

 Rights to use of federally registered trademarks in Utah, as in other states, are determined, in large measure, by the common law and state statutes. *See, e.g., Wrist-Rocket Mfg. Co. v. Saunders Archery Co.,* 578 F.2d 727, 730 (8th Cir.1978) (state common law circumscribes the rights accompanying registration with the PTO). The rights accompanying a federal trademark registration are, to a great extent, coextensive with the rights acquired at common law.[4] *Value House v. Phillips Mercantile Co.,* 523 F.2d 424, 428 (10th Cir.1975) (the Lanham Act "does not go beyond protection under common law principles which afford rights growing out of use") (citing *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918)). *Wrist-Rocket Mfg. Co. v. Saunders Archery Co.,* 516 F.2d 846, 850 (8th Cir.) ("registration does not confer upon the registrant rights not possessed at common law. It is not a sword. To prevail in the infringement action [plaintiff must] establish his exclusive right to use the trademark independent of the registration"), *cert. denied,* 423 U.S. 870, 96 S.Ct. 134, 46 L.Ed.2d 100 (1975); *Caesars World, Inc. v. Caesar's Palace,*

490 F.Supp. 818, 822 (D.N.J.1980) (common law rights in service or trademarks exist independently of statutory provisions for registration and are not affected by the fact that the trademarks were registered after another began its use of the marks). Therefore, although plaintiff has not pleaded a cause of action for infringement of a common law trademark, GTE's common law rights of usage of the trademark, if any, in the Wasatch Front region must be determined according to Utah's standard for common law trademark acquisition and infringement.[5] Accordingly, plaintiff will succeed on its first, second and fourth claims only if it has shown that it obtained a validly registered trademark with the PTO on October 22, 1982, which defendant has infringed as measured by common law and statutory law applicable in Utah.

B. *Remote Area Exception to Federal Registration*

Moreover, defendant's common law right of usage, if any, of "General Telephone" in the relevant area is significant to a resolution of the issues herein. Where two parties acquire common law rights to a trademark in *different* areas, "a registered owner's rights can become incontestable[6] but

4. The Tenth Circuit has addressed the extent of the protection afforded a party in the use of a trademark registered under the Lanham Act, which rights go beyond those acquired at common law. *See Value House v. Phillips Mercantile Co.,* 523 F.2d 424 (10th Cir.1975). First, "registration is constructive notice of the registrant's claim of ownership and affords protection which is nationwide and not confined to actual use of the mark." *Id.* at 429 (citing 15 U.S.C.A. § 1072). Second, "[r]egistration also brings the right to rely on the evidentiary presumptions of 15 U.S.C.A. § 1115 ... which include the registrant's exclusive right to use." *Id.* (citing *In re Beatrice Foods Co.,* 429 F.2d 466, 472 (C.C.P.A.1970)). However, that presumption "shall not preclude an opposing party from proving any legal or equitable defense or defect which might have been asserted if such marks had not been registered." 15 U.S.C. § 1115(a). One statutory defense under 15 U.S.C. § 1115(b)(5) allows a prior use exception to the incontestability rights, one may acquire under the Act. *See infra* note 6. A fortiori, that exception is available where the registered mark has not become incontestable. *See Value House v.*

*Phillips Mercantile Co.,* 523 F.2d 424, 429 (10th Cir.1975).

5. Neither plaintiff nor defendant registered the "General Telephone" mark under the Utah Trademark Statutes, *Utah Code Ann.* § 70–3–1 *et seq.* However, Utah law specifically recognizes a cause of action under the common law for an unregistered trademark. *See id.* § 70–13–15. As has been discussed, the common law rights in the trademark "General Telephone" in the Wasatch Front region are of particular significance to the rights GTE has acquired due to its registration with the PTO.

6. "Incontestability" requires continuous use of the mark for five consecutive years subsequent to the date of registration, provided that the mark does not infringe a valid right acquired under the common law of a state by use of the trademark prior to the date of publication of the registered mark. 15 U.S.C. § 1065. Several exceptions to incontestability are provided under the Act. However, the court need not address those exceptions because five years has not

the other common-law owner retains exclusive rights to the mark in areas where his rights antedated registration." *Wrist-Rocket Mfg. Co. v. Saunders Archery Co.,* 578 F.2d 727, 730 (8th Cir.1978) (registration will not deprive another good faith user in a separate market of the protections acquired at common law). On this point, the Tenth Circuit affirmed a case in which the lower court stated:

> It has long been the law that the prior appropriation of a trademark in one geographical market does not entitle the first user to prevent a second user from using the same trademark in a separate and geographically remote area if the second user selected its mark in good faith.

*Big O Tire Dealers, Inc. v. Goodyear Tire & Rubber,* 408 F.Supp. 1219, 1239 (D.Colo. 1976), (citing *Hanover Star Milling Co. v. Metcalf,* 240 U.S. 403, 36 S.Ct. 357, 60 L.Ed. 713 (1916); *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918); and *Value House v. Phillips Mercantile Co.,* 523 F.2d 424 (10th Cir.1975)), *aff'd,* 561 F.2d 1365 (10th Cir.1977), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978). Good faith is not vitiated by a user's knowledge of the existence of a prior user. *Id.; see also Proctor and Gamble Co. v. Johnson and Johnson, Inc.,* 485 F.Supp. 1185, 1201 (S.D.N.Y.1979) ("good faith can be found even when the junior user has both actual and constructive notice of the senior user's mark"), *aff'd,* 636 F.2d 1203 (2d Cir.1980). Good faith depends on whether adoption of the mark was intended to palm off or take advantage of the goodwill and reputation of the prior user.

### C. *Common Law Principles Applicable in Utah*

▆ Utah law provides a cause of action for common law trademark infringement. *See Utah Code Ann.* § 70–3–15.[7] In order for a party alleging infringement of a trademark not registered under Utah or federal statutes to prevail the party must show the existence of several factors. Where the trademark is composed of words that are commonly used in everyday speech and belong in the public domain or are descriptive of the product or service, the user of the mark must have developed a reputation and goodwill for its business and its products or services, and the words must have acquired a "secondary mean-

---

passed from the date GTE's trademark was obtained and registered.

Incontestability under the Act constitutes "conclusive evidence of the registrant's exclusive right to use the registered mark in commerce or in connection with the goods or services specified in the affidavit filed under the provisions of said Section 1065 subject to any conditions or limitations stated therein," except when certain defenses or defects are established. 15 U.S.C. § 1115(b). Those defenses and defects are listed in Section 1115(b)(1)–(7). *See also supra* note 4, discussing the statutory defense to incontestability under 15 U.S.C. § 1115(b)(5).

**7.** The Utah Supreme Court explained the reason the Courts have recognized, at common law, exclusive rights in the use of trademarks:

> When one in conformity with [the] privilege [of engaging in freedom of competition] engages in business and by dint of honesty, industry and merit establishes a good name and reputation for his product or service, the goodwill engendered is an important factor in the value of the product or service and in the business of its user. The reputation for quality becomes known variously through the use of tradenames, brand-names, trade-marks, and other means of identification.

> \* \* \* \* \* \*

> When any such identification of a product or service has been established in the mind of the public, there is not only the valuable interest therein which belongs to its creator, but the public also has an interest to be protected in order that it can safely rely on the established reputation for quality. Where such a reputation has been earned, to permit someone who had nothing to do with developing it to appropriate and use it as his own, results in a two-pronged evil: depriving the one who created it of the reward of his efforts; and deceiving the public. The encouragement of meritorious service and the good order of society demand the recognition of these interests. Such a pirating of that which belongs to another and deceiving the public is so plainly contrary to principles of fairness and good conscience that courts of equity have not hesitated to grant redress.

*Allen's Products Co. v. Glover,* 18 Utah 2d 9, 414 P.2d 93, 95 (1966).

ing";[8] that is,—the trademark must have come to mean, in the minds of the general public, the party's particular business and products, as opposed to the general or dictionary meaning of the words. *George v. Peterson*, 671 P.2d 208, 210–11 (Utah 1983) (citing *Budget System, Inc. v. Budget Loan & Finance Plan*, 12 Utah 2d 18, 24, 361 P.2d 512, 516 (1961)); *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir.1983). Factors that bear on secondary meaning include length of use, continuity of use, extent of advertising and success of the enterprise. Once secondary meaning is established, the holder of the trademark must show that the alleged violator's trademark is sufficiently similar to produce confusion among the public.

Under Utah law applicable to the facts herein, acquisition of a common law trademark simply means that a party, through its business efforts, has developed common terms or descriptive terms that have gained secondary meaning in the public mind and which are entitled to certain protections. Those protections extend only as far geographically as the secondary meaning of the term extends. The protectable interest, then, is coextensive with the trademark's reputation. *George v. Peterson*, 671 P.2d 208, 210–12 (Utah 1983). The terms "General" and "Telephone" appropriately fit the category of common or generic terms that must acquire secondary meaning as defined by Utah law before protection is accorded. Indeed, the terms "General" and "Telephone" when combined, become descriptive of the goods and services available through defendant's business, also requiring a finding of second meaning before protection is accorded. *See supra* note 8. Because of the defenses available at common law and under the federal statute, the extent of either party's common law right in the trademark "General Tele-

8. "Secondary meaning" is a common law trademark doctrine that applies to words which ordinarily are not entitled to protection because they are commonly used in everyday speech and thus belong in the public domain.... Such words include geographical terms ... and descriptive or generic words.... The doctrine of secondary meaning provides that if a trademark or tradename composed of common words is entitled to protection, the user of the mark or name must

 by his efforts and expenditures, ha[ve] developed a reputation and good will for [its] business and its products, so that such name has come to mean, in the minds of the general public, that particular business and its products.

 ... In other words, when a substantial number of patrons of plaintiff's business understand the word not in its primary, dictionary sense, but as signifying plaintiff's product or business, it acquires a secondary meaning. *George v. Peterson*, 671 P.2d 208, 210–11 (Utah 1983) (citations omitted). Also, the Tenth Circuit in *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 939 (10th Cir.1983) has elaborated on the concept of "secondary meaning":

 The use of terms or marks falls into four broad categories for purposes of legal recognition: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful.... A generic mark has been described as referring to "'a particular genus or class of which an individual article or services is but a member.'" ... Because a generic mark refers to a general class of goods, it does not indicate the particular source of an item. Consequently,

such a mark receives no legal protection and may not be registered alone as a trademark. A term that was once a valid trademark may become generic through usage and popular acceptance, and thus no longer be eligible for registration, e.g., escalator, thermos.... A generic word, such as "cola" may be part of a valid trademark, e.g., Coca-Cola. Although the holder of such a valid trademark may not prevent another from incorporating the *generic* term into a trademark, e.g., Pepsi-Cola, he can prevent its use in a trademark which is so similar to his own that the whole name is likely to be confused with his trademark, e.g., Koka-Cola....

"A 'descriptive' term 'identifies a characteristic or quality of an article or service,' ... as, for example, its color, odor, function, dimensions, or ingredients." ... Because a descriptive term is one which a competitor would likely need to use in describing his product, the term does not indicate that a product comes from a single source.... Therefore, a trademark that is descriptive may be registered only if it has acquired a secondary meaning by becoming "distinctive of the applicant's goods in commerce." ... To establish a secondary meaning, it is not necessary to show that the public is aware of the name of the manufacturer of a product; it is sufficient if the public is aware that the product comes from a single, though anonymous, source.

*Beer Nuts*, 711 F.2d at 939 (citations omitted).

"phone" in the Wasatch Front area is critical to both parties' claims.

## D. *Confusion, Mistake or Deception*

■ Additionally, assuming the right to a trademark in Utah, relief under the Lanham Act will be denied unless a plaintiff can show that the allegedly infringing party's use is likely to cause confusion, or to cause mistake, or to deceive. *Value House v. Phillips Mercantile Co.*, 523 F.2d 424, 429 (10th Cir.1975). The Tenth Circuit has explained the applicable test for determination of confusion, mistake or deception: "It is the generally accepted rule that a designation is confusingly similar to a trademark if an ordinary prospective purchaser, exercising due care in the circumstances, is likely to regard it as coming from the same *source* as the trademarked article." *Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir.1984) (emphasis in original) (quoting *Avrick v. Rockmont Envelope Co.*, 155 F.2d 568, 572 (10th Cir.1946)). The Tenth Circuit recently has specifically defined this "likelihood of confusion" test, which requires consideration of several factors:

(a) the degree of similarity between the designation and the trade-mark or trade name in
(i) appearance;
(ii) pronunciation of the words used;
(iii) verbal translation of the pictures or designs involved;
(iv) suggestion;
(b) the intent of the actor in adopting the designation;
(c) the relation in use and manner of marketing between the goods or services marketed by the actor and those marketed by the other;
(d) the degree of care likely to be exercised by purchasers....

*J.M. Huber Corp. v. Lowery Wellheads, Inc.*, 778 F.2d 1467, 1470 (10th Cir.1985) (citing *Restatement of Torts* § 729 (1938) and *Beer Nuts, Inc. v. Clover Club Foods Co.*, 711 F.2d 934, 940 (10th Cir.1983)); *see also Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir.1984) (setting forth the Restatement factors as the applicable test for alleged violations of Section 1114 and 1125 and for state claims of infringement under Utah statutory and common law). The above cited list "is not exhaustive, and the facts of a particular case may require consideration of other variables." *J.M. Huber Corp.*, 778 F.2d at 1470 (citing *Beer Nuts*, 711 F.2d at 940).

## E. *False Designation of Origin*

■ Plaintiff's third cause of action does not require a finding of either a common law or a registered trademark. It requires only a showing of false designation of origin. The test for such a determination is the likelihood of confusion test discussed above. *See Amoco Oil Co. v. Rainbow Snow*, 748 F.2d 556, 558 (10th Cir.1984). However, a finding of the defendant's good faith adoption and common law acquisition necessarily would preclude a claim under 15 U.S.C. § 1125(a).

■ Under the aforesaid legal principles, two tests emerge to measure alleged violation of the Lanham Act. *First,* a showing of acquisition and use of the trademark in the relevant area. Plaintiff must show that it acquired common law rights before those rights may be sanctioned with the additional air of validity pursuant to registration of the mark with the PTO. Should plaintiff have failed to acquire such common law rights in the trademark in Utah, registration of the trademark with the PTO would not necessarily help. Additionally, senior usage and acquisition at common law in a remote area constitute defenses to Lanham Act claims. Even where the plaintiff first used the trademark, if such use did not reach a remote area where defendant adopted the trademark in good faith, defendant would prevail.

■ *Second,* once a showing has been made of a right in the trademark in the relevant area, the plaintiff must show a likelihood of confusion, mistake or deception due to the alleged violator's use. The "likelihood of confusion" test also is appli-

cable to the designation of origin question under 15 U.S.C. § 1125.[9]

## ANALYSIS

### A. GTE's Common Law Rights in the Wasatch Front Prior to Williams' Usage in 1974

The first question we must address is whether prior to 1974, when Williams began his use of "General Telephone," GTE had acquired a common law trademark of "General Telephone" in the Wasatch Front geographic region.

#### 1. Advertising

■ Prior to 1974, GTE was known as "General Telephone Corporation" and "General Telephone and Electronics Corporation." GTE experienced national identity problems with the name "General Telephone and Electronics Corporation," and in 1971 it adopted the logo "GTE," which was emphasized in national advertising. In 1971 GTE downgraded the use of "General Telephone and Electronics Corporation," and upgraded the use of "GTE." In 1973, GTE initiated a corporate advertising strategy to eliminate "General Telephone and Electronics Corporation" as the corporate name and symbol and to replace it with the logo "GTE." From and after 1971, GTE's operating subsidiaries, most of which used the term "General Telephone" accompanied with the name of the geographical region where they respectively provided services, began using the GTE logo in their local advertising schemes to advise the public about the broad corporate identity. Since 1971 GTE has never used the term "General Telephone" alone to identify its services or products, but has always employed and continues to employ it with a geographic description and/or the GTE logo.

It is clear that GTE maintained two levels of advertising, national and local. Because no "General Telephone" operating subsidiary existed in Utah or, indeed, existed within a bordering state of Utah (with the exception of northern Idaho), none of the local operating company advertising reached Utah. Only national advertising of the parent corporation reached Utah, but by 1974 that advertising emphasized "GTE" in lieu of "General Telephone and Electronics Corporation." Accordingly, prior to Williams' use of "General Telephone" in 1974, little or no advertising of GTE or a subsidiary, which employed the term "General Telephone," was conducted in or reached Utah. National advertising that reached Utah prior to GTE's identity crisis in 1971 may have used the term "General Telephone," but use of that term was not continuous.

#### 2. Corporate Presence—Products or Services

Prior to 1974, GTE Corporation did not have an operating subsidiary or any other subsidiary in Utah that offered products or services under the name or mark "General Telephone." GTE may have generated some revenues in Utah through its General Telephone Operating Group.[10] For instance, some telephone services rendered outside Utah were billed to and paid from Utah. Operating subsidiary customers who traveled to Utah and placed long distance telephone calls from Utah may have used a General Telephone Operating Company credit card, may have made "collect calls" to a General Telephone Operating Group number or may have requested that

---

**9.** For purposes of analysis these issues are separated. However, the questions of whether one has acquired a common law trademark in a particular geographic area and of whether defendant's use is likely to cause confusion, mistake or deception are related questions. For example, if the public consumer in the Wasatch Front area thinks of neither GTE nor Williams' company when he or she hears "General Telephone," that fact could have a bearing on whether either party had acquired a common

law right to the trademark in the Wasatch Front. Also, no confusion would exist. Where the public consumer thinks of one or the other but not of both, that fact could have a bearing on who was being confused with whom and who had established a prior use in the area.

**10.** The "General Telephone Operating Group" consists of the GTE operating subsidiaries located in many states throughout the country.

a call be charged to a General Telephone Operating Group number. However, the revenues were not substantial.

It is apparent from the lack of continuous use of "General Telephone" in national advertising that reached Utah and the insubstantial revenues generated in Utah under the auspices of "General Telephone" Operating Companies, that GTE had not acquired a common law trademark in "General Telephone" in Utah prior to 1974. The term had not gained secondary meaning in the public mind through extensive and continuous use in the area, through extensive advertising of "General Telephone" products or services in the area or through the offering of products or services in a successful enterprise in the area.

## B. *GTE's Common Law Rights in the Wasatch Front after Williams' Usage in 1974*

It is axiomatic that any claim GTE has to a common law trademark in "General Telephone" in the Wasatch Front after 1973 must be considered in light of Williams' usage in the same area. However, the facts show that GTE's post-1974 involvement in the Utah market has not changed significantly from the pre–1974 involvement, at least in GTE's favor. National advertising still reached Utah but with a continued decline in the use of "General Telephone" to identify the parent. No subsidiary that employs the name "General Telephone" has conducted business or provided products or services in this market at any time before or after 1974, and no local advertising has been conducted here, although the General Telephone Operating Group continued to generate some revenues as described above. This Court is of the opinion that GTE's presence and involvement in Utah while employing the term "General Telephone" to identify its products and services is insufficient to satisfy Utah's common law standard for acquisition of a trademark. Thus, GTE is not entitled to the protections accorded the holder of a common law trademark in Utah.

## C. *Williams' Common Law Rights in the Wasatch Front Area After 1973*

### 1. *Williams' Usage of "General Telephone"*

■ Williams began his use of "General Telephone" in the Wasatch Front area to identify his paging telephone services in February 1974, and his portable/mobile telephone services in March or April 1974. Williams' use in this regard has been continuous since early 1974 to the present. Williams' business is located in the Wasatch Front area and it provides services to consumers in that area only although some billing extends beyond Utah's borders. Williams has built his business into a successful, lucrative and well reputed organization. Advertising, targeted only at the relevant market herein, has accounted for much of Williams' success and good will.

### 2. *Innocent Adoption—Good Faith*

At the time Williams adopted the "General Telephone" trademark in 1974, he had heard of a company called "General Telephone and Electronics of California." At that time, he had no knowledge that GTE used or claimed "General Telephone" as a trademark and he was unaware of a connection between GTE and "General Telephone and Electronics of California." Because GTE did not have a registered trademark of "General Telephone" in 1974, Williams also did not have constructive notice of GTE's usage. *See supra* note 4. At no time did Williams intend to palm off his services as originating with GTE, nor did he intend to benefit from GTE's alleged goodwill or reputation in this market. Indeed, Williams was unaware of GTE's objections to his use of "General Telephone" until GTE notified him in a letter dated September 1, 1982, well after GTE knew of Williams' use of the trademark.

This Court is of the opinion that "General Telephone" has acquired secondary meaning in the Wasatch Front area as being associated with and, indeed, as being the products and services of Williams' business. Williams' continuous and extensive use of the term, an historically successful

and growing enterprise and the development of substantial goodwill through advertising and providing quality products and services show that "General Telephone" has acquired secondary meaning in the market. Because Williams adopted the trademark in good faith, he now is entitled to the protections at common law accorded the holder of a common law trademark.

### D. *GTE's Registered Trademark versus Williams' Common Law Trademark*

The next question is the effect GTE's October 22, 1982 registration of the trademark "General Telephone" with the PTO has on Williams' common law rights in "General Telephone" in the Wasatch Front. Clearly, Williams' common law ownership and usage antedated GTE's registration but post-dated GTE's usage in other markets. As discussed above, *see supra* Section A, *Applicable Legal Principles*, the law clearly allows such a common law owner, who adopted the trademark in good faith, exclusive rights in the market preempted by common law ownership, even to the exclusion of the registrant. The common law rights in the Wasatch Front which arose prior to registration constitute a valid defense to incontestability under 15 U.S.C. §§ 1065 and 1115(b)(5). "The plain meaning of this language is that if a party has acquired common-law trademark rights continuing since before the publication of the federal registration, then to that extent the registration will not be incontestable." *Wrist-Rocket Mfg. Co. v. Saunders Archery Co.*, 578 F.2d 727 (8th Cir.1978) (referring to 15 U.S.C. § 1065 and § 1115(b)(1)(5) and citing 4 Callman, Unfair Competition, Trademarks and Monopolies § 97.3(c)(3) (3d Ed. 1970)). Clearly, where GTE's trademark has yet to satisfy the statutory requirements of incontestability, Williams' common law rights have equal force. *See supra* note 4 and cases cited therein.

### E. *Confusion, Mistake or Deception*

Although the Court need not reach the issue of whether defendant's usage is likely to cause confusion, mistake or deception, it is appropriate for the court to address that point because of the emphasis given the question at trial. The Restatement of Torts factors, which were specifically adopted by the Tenth Circuit as discussed above, constitute the general focus of the "likelihood of confusion" test. However, implicit in that test are factors of overlapping geographic market and competition in providing similar goods or services. Without these two factors, confusion, mistake or deception is unlikely. Under Restatement factor (a), the claimed trademark and the alleged infringing usage are identical, "General Telephone"; under Restatement factor (b), the Court has found that defendant adopted the trademark in good faith; under Restatement factor (c), some of the goods and services of plaintiff and defendant are identical and are marketed in similar ways, although on much different scales and in different markets; none of the same products are marketed in the same market under the trademark "General Telephone"; and under Restatement factor (d), the degree of care likely to be exercised by purchasers is unclear, but the evidence indicates that few if any purchasers of Williams' goods and services would assume a false origin or association. That is because of the implicit factors of competition in the relevant market under the same or an allegedly confusingly similar trademark. Defendant's usage is in a remote market where GTE does not compete in any respect under the name "General Telephone." GTE does not even provide non-competing goods or services under the trademark "General Telephone" in the relevant market. The only advertising that reaches Utah emphasizes the new corporate name "GTE," [11] which is neither the same as nor strikingly similar to "General Telephone." Some minimal and wholly inconsequential confusion could result where a former General Telephone Operating Group customer desires employment with Williams' company or seeks paging or mobile/portable telephone services in Utah.

**11.** GTE formally adopted its current corporate name on July 1, 1982.

Even then confusion is unlikely where GTE provides goods and services known as the "GTE Pocket Pager."

Based on the foregoing the Court is of the opinion that defendant's usage is not likely to cause confusion, mistake or deception.[12]

### F. *False Designation of Origin*

■ Plaintiff's third cause of action fails for the reasons set forth above under the court's analysis of the "likelihood of confusion" test where defendant adopted the trademark in good faith and his past and future use of the trademark is not likely to cause confusion, mistake or deception. Where he has acquired a common law trademark through appropriate usage, no false designation of origin or false description exists.

### G. *Estoppel—Laches*

■ The Court feels it should address one of Williams' equitable defenses. The facts in this regard are not favorable to GTE. One year after Williams began using the trademark, GTE sales personnel employed by GTE Products Corporation knew or should have known that someone other than GTE was using "General Telephone" as a trademark. Prior to 1979 no GTE personnel investigated the alleged infringement. In 1979 other GTE employees became aware of Williams' usage, but nothing was done until March 1981. At that time, GTE's in-house counsel learned of Williams' usage and then discovered that GTE had not previously obtained a registered trademark for the "General Telephone" mark. GTE's counsel knew that the common law rights of enforcement would have been the only tool to stop defendant from using "General Telephone."

He therefore initiated a registration procedure by filing with the PTO a Petition to Make Special in June 1981. GTE did not identify Williams as the alleged infringer to the PTO because it wanted to avoid Williams' notification until it had acquired the trademark or was certain to obtain it. From March 1981 to September 1982, when GTE informed Williams of the alleged infringement, GTE's counsel was aware that Williams was actively using the trademark and promoting his goods, services and business under the mark. Yet, GTE took no steps to notify Williams of the alleged violation until it was certain to receive the mark, but allowed Williams to continue developing goodwill and recognition with the public under the mark "General Telephone." Yet, plaintiff now claims that Williams' usage is wrongful.

The Court will not detail the effort and expense Williams has committed to the development of a successful, well reputed business with services and products under the trademark "General Telephone." However, between 1975 and 1982, when GTE knew or should have known of Williams' usage and could have taken steps to mitigate Williams' losses caused by a change in identity, the effort and expense were substantial.

The Court is of the opinion that GTE's delay was unreasonable and prejudicial to defendant. GTE could have made reasonable inquiry into the alleged infringement at a date earlier than March 1981 but failed to do so. *See Georgia-Pacific Corp. v. Great Plains Bag Co.*, 614 F.2d 757, 763 (C.C.P.A.1980); *Safeway Stores, Inc. v. Safeway Quality Foods, Inc.*, 433 F.2d 99, 103 (7th Cir.1970). Although the length of time necessary to establish laches depends

---

**12.** Were GTE and Williams' company competing under the mark "General Telephone," the result would likely be different on the question of confusion, mistake or deception. However, because Williams acquired a common law trademark in "General Telephone" in the Wasatch Front region, GTE's usage most likely would cause the confusion, mistake or deception. *See, e.g., Big O Tire Dealers v. Goodyear Tire and Rubber Co.*, 561 F.2d 1365, 1371–72

(10th Cir.1977) (discussing the concept of "reverse confusion," wherein "the infringer's use of the plaintiff's mark results in confusion as to the origin of plaintiff's product") (citing *Westward Coach Mfg. Co. v. Ford Motor Co.*, 388 F.2d 627 (7th Cir.), *cert. denied,* 392 U.S. 927, 88 S.Ct. 2286, 20 L.Ed.2d 1386 (1968)), *cert. dismissed,* 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

on the circumstances of each case and on the degree of injury and prejudice to the defendant, the Court is not persuaded that plaintiff's reasons for the delay were reasonable. Therefore, where plaintiff could have notified defendant of the objection but consciously chose to allow him to continue spending time and money developing rapport with the public under the trademark "General Telephone," almost any delay would be unreasonable.

## CONCLUSION

Based on the foregoing, the Court concludes that Williams is entitled to continue using the trademark "General Telephone" in the Wasatch Front region. That right of usage is exclusive to Williams in the Wasatch Front area.