**FIRST KEYSTONE FEDERAL SAVINGS BANK**

v.

**FIRST KEYSTONE MORTGAGE, INC.**

No. 94–CV–1894.

United States District Court,
E.D. Pennsylvania.

April 25, 1996.

---

Eugene E. Renz, Jr., Jeffrey K. Rucker, Eugene E. Renz, Jr., P.C., Media, PA, for plaintiff.

Peter J. Mooney, Laura W. Brewer, White and Williams, Philadelphia, PA, for defendant.

## DECISION

JOYNER, District Judge.

This action is one by First Keystone Federal Savings Bank against First Keystone Mortgage, Inc. for federal trademark infringement and false designation of origin claims under the Lanham Trademark Act of 1946, as amended, 15 U.S.C. §§ 1051–1127 (1963, 1982 & Supp.1995) and common law claims of unfair competition, trademark misappropriation and common law trademark infringement. Earlier in this litigation's history we denied cross-motions for summary judgment, finding that the parties had established questions of fact as to material issues. We then proceeded to a bench trial and now, after three days of testimony, the entrance of many documents into the record and the submission of proposed findings of fact and conclusions of law, we are prepared to proceed to a final disposition of this action.

## FINDINGS OF FACT

### PLAINTIFF

1. Plaintiff is a publicly held full service savings bank with its main office in Media, Pennsylvania and branch offices elsewhere in Delaware County, Pennsylvania. Otto Dep., pp. 29–31; Tr., 9/11/95, p. 159.

2. One of Plaintiff's bank services is the provision and servicing of first mortgage residential loans. These loans are made primarily in the Delaware and Chester County regions of Pennsylvania, with some loans made in Bucks and Montgomery Counties, Pennsylvania, Southern New Jersey and New Castle County, Delaware. Tr., 9/11/95, pp. 15, 19, 160–63.

3. Mortgage loans account for 90 to 95% of Plaintiff's business. Tr., 9/11/95, p. 16.

4. Plaintiff spends approximately $200,000 per year on advertising. Tr., 9/11/95, p. 20.

### DEFENDANT

5. Defendant's primary business is provision of first mortgage residential loans. Tr., 9/12/95, p. 22.

6. Defendant's main office is in Paoli, Pennsylvania and it has branch offices in Chester and Delaware Counties, Pennsylvania, Clark's Summit, Pennsylvania, as well as in Voorhees, New Jersey and Greenville, Delaware. Tr., 9/12/95, pp. 45, 58; Pl.'s Ex. 1.

7. Defendant's West Chester branch is known as Franklin Mortgage Co. Tr., 9/12/95, p. 197.

8. Defendant spent approximately $10,000 to $11,000 a year on advertising between 1987 and 1988 and approximately $18,000 to $20,000 in 1992. Tr., 9/13/95, p. 37.

### THE NAMES OF THE PARTIES

9. Plaintiff owns a registration for FIRST KEYSTONE FEDERAL, Registration No. 1,324,996, dated March 12, 1985. Pl.'s Ex. 202.

10. Defendant incorporated its business in March, 1985 with the Pennsylvania Secretary of State under the name First Keystone Mortgage, Inc. Tr., 9/12/95, p. 57; Tr., 9/13/95, p. 4.

11. Defendant first tried to incorporate under the name Keystone Mortgage. A search with Pennsylvania's Secretary of State revealed, however, that that name was in use, but it was advised that First Keystone Mortgage was available. Tr., 9/12/95, p. 83.

12. At the time Defendant incorporated, neither its founder nor its attorney was aware of Plaintiff's existence. Tr., 9/12/95, pp. 60–61, 85; Tr., 9/13/95, p. 5.

13. At the time Defendant incorporated, there was no attempt to associate with Plaintiff or copy its name. Tr., 9/12/95, p. 85.

14. Defendant advertised the name of the corporation and its articles of incorporation in two Chester County newspapers in April, 1995 and there was no objection or communication by anyone to Defendant's name. Tr., 9/13/95, pp. 6–7; Tr., 9/12/95, p. 83; Def.'s Exs. 24, 25.

**15.** Defendant chose its name to identify itself as a Pennsylvania-based entity and because a keystone denotes strength. Tr., 9/12/95, p. 87. In its slogan, "service is the Keystone to our success," the word keystone refers to service, not the state of Pennsylvania. *Id.* at 30, 140.

*COMPARISON OF THE PARTIES' MORTGAGE BUSINESSES*

**16.** The residential mortgage application process is heavily regulated by federal regulations and the process is largely standardized by the Federal National Mortgage Association's (Fannie Mae) requirements. Tr., 9/11/95, pp. 29–31; Tr., 9/12/95, p. 194.

**17.** The mortgage procurement process is anxiety filled and delays that hinder the process negatively impact the relationships among buyer, realtor and mortgage lender. Tr., 9/11/95, p. 67; Tr., 9/13/95, p. 91.

**18.** The most important consideration for a borrower is the rate, with service, convenience and lender reputation following. Tr., 9/12/95, pp. 51, 78; Tr., 9/13/95, p. 90.

**19.** Defendant's first office opened in Wayne, Pennsylvania, in Delaware County in 1987, but was moved shortly thereafter to Paoli, Pennsylvania, in Chester County. Tr., 9/12/95, p. 58.

**20.** Defendant has no loan originators operating in Delaware County and Plaintiff has never had an office outside of Delaware County. Tr., 9/11/95, p. 159; Tr., 9/13/95, p. 86.

**21.** Defendant has used commissioned solicitors to generate business since it began operations in 1987. Tr., 9/11/95, p. 138. Plaintiff began using commissioned solicitors for the first time in 1992. *Id.* at 17, 138.

**22.** Defendant has no specific intent to increase business in Delaware and Chester Counties as opposed to its intent to increase its business, in general, everywhere. Tr., 9/13/95, pp. 85–86.

**23.** Plaintiff's loans, by far, have been made in Delaware and Chester Counties with only a small fraction made outside that area. Tr., 9/11/95, pp. 162–63.

**24.** Plaintiff's advertising reaches some locales in which Defendant is active outside of Delaware and Chester Counties, but Plaintiff's advertising is not specifically directed to those areas. Tr., 9/11/95, pp. 161–62.

**25.** Defendant's business grew steadily between 1988 and 1993. Pl.'s Ex. 226.

**26.** Since 1989, Defendant's closed loan volume has always exceeded Plaintiff's. Def.'s Exs. 38, 39.

**27.** The following chart compares the parties' relative annual loan amounts for residential first mortgages, in millions of dollars. Pl's Exs. 226, 228.

| Year | Plaintiff | Defendant |
| --- | --- | --- |
| 1988 | 44 | 48.5 |
| 1989 | 23.1 | 45.4 |
| 1990 | 14.8 | 124.9 |
| 1991 | 55.2 | 198.8 |
| 1992 | 71 | 354.5 |
| 1993 | 46.2 | 285.4 |
| 1994 | — | 120 |

**28.** Defendant's greatest percentage increase in loan closings occurred between 1989 and 1991. Pl.'s Ex. 226.

**29.** Plaintiff's closed loans declined between 1988 and 1991. Tr., 9/11/95, pp. 112–13; Pl's Ex. 227.

**30.** Both parties, as well as other mortgage lenders in the market, experienced large increases in refinancing and other loan business in 1992 because of dropping interest rates. Tr., 9/11/95, p. 139; Tr., 9/12/95, pp. 169, 218.

**31.** Defendant currently employs approximately 23 people. In 1993, it employed as many as 160 people. Tr., 9/12/95, p. 15. Since 1992, more than half its offices have closed and its gross asset value has shrunk in half from 14 million. *Id.* at 14–15, 175; Tr., 9/13/95, p. 87. The decline in Defendant's business since 1994 is largely attributable to the decline in mortgage loan demand in that time. *Id.* at 15–16.

**32.** For approximately one year, Defendant sub-contracted out servicing of the loans it made, but never personally serviced its own loans. Tr., 9/12/95, pp. 41, 156, 175, 204–05.

**33.** Adding servicing to Defendant's product brought it into closer competition with Plaintiff. Tr., 9/12/95, p. 157.

34. Both parties compete for first mortgage residential loan business in Delaware and Chester Counties. Tr., 9/11/95, pp. 19–21, 114; Tr., 9/12/95, pp. 47, 63, 206; Tr., 9/13/95, p. 17.

35. Plaintiff does not offer government-backed mortgage loans, which is 30% of Defendant's business. Tr., 9/11/95, p. 23; Tr., 9/12/95, p. 43.

36. Defendant does not offer construction loans, which Plaintiff does. Tr., 9/13/95, pp. 14–15.

37. The parties do not compete in Scranton or Voorhees, N.J., Clark's Summit, Pa., or Greenville, De. Tr., 9/12/95, p. 47.

*PRE–LAWSUIT CONTACTS BETWEEN THE PARTIES AND GENERAL AWARENESS OF EACH OTHER*

38. Plaintiff's lending Senior Vice–President, Stephen Henderson, became aware of Defendant and its business in early 1988. Tr., 9/11/95, pp. 41, 120.

39. In early 1988, Henderson decided that there was a serious problem between the two parties' names. Tr., 9/11/95, p. 120.

40. In early 1988, Henderson told Plaintiff's President, Donald Purdy, that he thought Defendant's name was confusingly similar to Plaintiff's name. Tr., 9/11/95, p. 117.

41. Purdy instructed Henderson to create and maintain a file of evidence showing confusion between the two companies' names. Tr., 9/11/95, pp. 117–18. In 1988, Plaintiff developed a formal system for tracking and collecting evidence of confusion. *Id.* at 42.

42. By mid–1988, Henderson viewed Defendant as a direct competitor of Plaintiff's. Tr., 9/11/95, p. 120.

43. Purdy also instructed Henderson to telephone Thomas Toole, then the President of Defendant, to express Plaintiff's concern over the similarity of the two companies' names. Tr., 9/11/95, pp. 45, 120; Tr., 9/12/95, pp. 72, 79; Henderson Dep., pp. 18–19.

44. During that conversation, Toole asked Henderson if he had the authority to discuss this matter with Toole. Henderson conceded that he did not and Toole asked Henderson to have someone with authority contact him if Plaintiff wished to further discuss the matter. Henderson indicated that he would have his superiors contact Toole. Tr., 9/11/95, pp. 45, 121.

45. During that call, Toole indicated that his was just a start-up business and that he might consider changing Defendant's name if Plaintiff covered the costs associated with doing so. Tr., 9/12/95, p. 79.

46. When a business changes its name, it is harmed in that there is a financial cost involved, but also in that there is often a negative perception that the business has not been successful or had to go out of business. Tr., 9/12/95, p. 46–47.

47. After Henderson's telephone call to Toole, Defendant waited for a further communication from Plaintiff. Further, Defendant's shareholders discussed and considered Plaintiff's failure to pursue the name issue with Defendant. Tr., 9/12/95, pp. 75–77, 79–81.

48. Henderson told Purdy about his conversation with Toole in early 1988, but neither Purdy nor any other Plaintiff agent ever contacted Defendant to discuss the name issue until 1993. Tr., 9/11/95, p. 142.

49. Henderson continued to be concerned about the name similarity between the parties. He repeatedly expressed this concern to his superiors, including Plaintiff's Executive Committee. Tr., 9/13/95, p. 57; Henderson Dep., pp. 22–23; Otto Dep., pp. 22–23.

50. On September 8, 1989 and again on January 18, 1990, Plaintiff's Executive Committee authorized Plaintiff's lawyers to take action about the name issue. On September 15, 1988, Plaintiff's Board of Directors authorized Plaintiff's lawyers to examine the possibility of suing Defendant about the name similarity. Tr., 9/11/95, pp. 125–27, 135; Def.'s Exs. 52, 53, 54.

51. Plaintiff's current President, Mr. Guthrie, was then Plaintiff's solicitor. Tr., 9/11/95, p. 129.

52. Beginning in 1988, Henderson and other Plaintiff employees saw Defendant's employees and booths at seminars and trade shows and would, from time to time, obtain copies

of Defendant's promotional brochures. Tr., 9/11/95, pp. 131–32; Tr., 9/13/95, pp. 13–15.

**53.** Henderson was aware that after his 1988 phone call to Defendant, that Defendant had increased its number of offices, invested additional capital, started advertising in the local media and added new employees, and he informed his superiors at Plaintiff of these facts. Tr., 9/11/95, pp. 132–34.

**54.** Defendant's trade booths and written materials were always clearly marked "First Keystone Mortgage." Tr., 9/12/95, p. 86; Otto Dep., p. 34.

**55.** On at least one occasion, an employee of Plaintiff and the CEO of Defendant discussed referring business from Defendant to Plaintiff. Tr., 9/13/95, pp. 14–15, 17.

**56.** In 1992, a home-buyer applied for a mortgage with Defendant. Because Defendant could not grant her a loan, it recommended Plaintiff's services. A Defendant employee contacted a Plaintiff employee and transferred the application documents to Plaintiff, who subsequently made the loan to the home-buyer. Tr., 9/13/95, pp. 65–68; Morlock Stipulation.

**57.** When Defendant's mail was mistakenly sent to Plaintiff, Plaintiff would forward the mail to Defendant along with a letter indicating that the mail was misdirected and that future misdirected mail would also be forwarded. Pl.'s Exs. 211, 220.

**58.** The next contact about Defendant's name did not come until November, 1993, when Plaintiff delivered a cease and desist letter to Defendant. Henderson Dep., p. 21; Tr., 9/11/95, pp. 141–42.

**59.** The only explanation at trial to account for the delay between the 1988 and 1993 contacts was that Plaintiff had more pressing matters occupying its attention in that Plaintiff was attempting to go public in 1989, suffered an economic downturn between 1990 and 1991 and was very busy during the refinancing boom in 1992 and 1993. Tr., 9/11/95, pp. 45–47.

**60.** Since 1987, Defendant has developed goodwill and its name has become valuable. Tr., 9/12/95, pp. 46–47.

**61.** Defendant relied, at least in part, on Plaintiff's failure to follow up the name issue by opening new offices, advertising its name, becoming licensed to do FHA and VA work, becoming licensed by HUD, developing goodwill, soliciting business and otherwise attempting to build and develop a successful regional mortgage business. Tr., 9/12/95, pp. 75–76, 80–81; Tr., 9/13/95, pp. 31–43.

*STRENGTH OF PLAINTIFF'S MARK*

**62.** Pennsylvania is commonly known as the Keystone State and many companies in Pennsylvania include that word in their names. Def's Exs. 12, 14, 15; Tr., 9/13/95, pp. 161–62.

**63.** The words "first," "mortgage" and "federal" are commonly used by businesses in the financial industry. Def.'s Exs. 1, 12.

**64.** Businesses with the names of "Keystone Financial Group" and "Keystone Mortgage" are located in Delaware County and Lancaster, Pennsylvania. Def.'s Ex. 12; Tr., 9/11/95, p. 164.

**65.** Six Pennsylvania businesses other than the parties use the words "First Keystone" in their names. Def.'s Ex. 14.

*LIKELIHOOD OF CONFUSION*

**66.** Both parties are commonly informally referred to as "First Keystone." Tr., 9/11/95, p. 63; Tr., 9/12/95, pp. 26, 65, 160.

**67.** Both parties always use their full names in all name-bearing correspondence and/or documents. Tr., 9/13/95, p. 82.

**68.** Borrowers can be unsophisticated about the mortgage transaction, but because it is likely to be one of the biggest financial transactions in their lives, they tend to take great care about the process. Tr., 9/11/95, pp. 25, 151; Tr., 9/12/95, pp. 25–26; Tr., 9/13/95, p. 88.

**69.** There was no evidence that a borrower made an application with one party but intended to make it with the other. Tr., 9/11/95, p. 151.

**70.** Both parties advertise their rates in the same publications and use many of the vendors for services such as title searches, ap-

praisals and real estate agents. Tr., 9/11/95, p. 32, 103; Tr., 9/12/95, p. 31.

**71.** The parties' rates published in the National Reporter have been reversed on occasion. Tr., 9/11/95, pp. 21, 50; Pl.'s Ex. 6.

**72.** Both parties sell most of their loans to the Federal Home Loan Mortgage Corporation (Freddie Mac). Tr., 9/11/95, p. 101.

**73.** Plaintiff has received Defendant's confidential reports from Freddie Mac. Tr., 9/11/95, pp. 38, 59.

**74.** One of Defendant's borrowers presented a Defendant business card to Plaintiff believing Plaintiff was a branch of Defendant. Tr., 9/11/95, p. 53; Pl.'s Ex. 11.

**75.** A real estate agent referred a client to Plaintiff but the client contacted Defendant by accident. Tr., 9/11/95, p. 175.

**76.** Some of Defendant's own customers confused the parties. Tr. 9/11/95, p. 70; Tr., 9/13/95, p. 43.

**77.** Since early 1988, Plaintiff has received phone calls for Defendant approximately twice a week to three times a month. Tr., 9/11/95, pp. 182, 184; Pl.'s Exs. 7, 8, 10, 221–214, 221–427, 221–429, 221–253, 221–254, 221–256, 221–259, 221–271, 221–272, 221–278, 221–279, 221–280.

**78.** At least several of the people frequently called at Plaintiff's offices who do not work there also do not work for Defendant. Tr., 9/12/95, pp. 164–65; Tr., 9/13/95, p. 122.

**79.** Plaintiff established a system for its telephone receptionist to redirect misdirected telephone calls. Tr., 9/11/95, pp. 77, 180–81.

**80.** Plaintiff has received Defendant's mail since early 1988. Tr., 9/11/95, pp. 34, 42.; Pl.'s Exs. 13, 14, 16, 17, 19, 20, 21, 24, 25, 29, 31, 32, 33, 33a, 41, 47, 100, 101, 102, 103, 104, 105, 106, 107, 108, 109, 110, 112, 113, 114, 116, 208, 209, 210, 211, 220, 221–260.

**81.** No evidence was presented that demonstrated that every piece of misdirected mail or every misplaced phone call was the result of confusion as opposed to carelessness or accident. Tr., 9/13/95, pp. 62–63.

**82.** Defendant agrees that each parties' mail has been sent to the other party on

several occasions. Pl.'s Ex. 26; Tr., 9/12/95, p. 34.

**83.** Defendant's Post–Closing Document Control Clerk sent self-addressed stamped envelopes to Plaintiff to facilitate re-direction of Defendant's mail. Tr., 9/12/95, pp. 135, 138; Pl.'s Ex. 26.

**84.** Defendant has occasionally received mail intended for recipients other than both it and Plaintiff. Tr., 9/13/95, pp. 111–12.

*IMPACT ON PLAINTIFF'S REPUTATION AND BUSINESS*

**85.** Misdirected correspondence and phone calls could cause a delay in the mortgage transaction and affects Plaintiff's reputation. Tr., 9/11/95, p. 159; Tr., 9/13/95, pp. 93, 132.

**86.** There is no evidence that the misdirected correspondence or telephone calls ever delayed the settlement of any mortgage issued by either party. Tr., 9/11/95, p. 159; Tr., 9/12/95, p. 114; Tr., 9/13/95, pp. 99, 104, 123, 156.

**87.** Defendant has made inaccurate reports to HUD, the results of which are publicly released. If the inaccuracies or poor ratings are attributed to Plaintiff, which has received the highest rating for the past four years, its reputation could suffer. Tr., 9/13/95, pp. 140–51, 167–69.

**88.** Several confidential and proprietary documents have been released to each other and third parties as a result of misaddressing. Tr., 9/12/95, p. 200.

**DISCUSSION**

**I. Claims Under 15 U.S.C. § 1114 and Common Law Tort of Trademark Infringement**

Plaintiff alleges that Defendant's name infringes Plaintiff's registered service mark. A party can establish trademark infringement under § 32 of the Lanham Act by showing that (1) its mark is valid and legally entitled to protection; (2) it is owned by plaintiff; and (3) defendant's use of the mark is likely to confuse consumers.[1] 15 U.S.C.

---

**1.** The standards for common law infringement in Pennsylvania are the same as those for violations

§ 1114; *Ford Motor Co. v. Summit Motor Prods.*, 930 F.2d 277, 291 (3d Cir.), *cert. denied*, 502 U.S. 939, 112 S.Ct. 373, 116 L.Ed.2d 324 (1991) (quoting *Opticians Ass'n v. Independent Opticians*, 920 F.2d 187, 192 (3d Cir.1990)).

## 1. VALIDITY

█ When a plaintiff's mark is registered and has become "incontestable" under 15 U.S.C. § 1065, the elements of validity, ownership and entitlement to protection are conclusively proved. *Ford Motor Co.*, 930 F.2d at 291. If a mark is not incontestable, a plaintiff must show that its mark is valid in that it has a secondary meaning. *Id.*

If the owner of an incontestable mark brings an infringement action, the defendant still has a number of statutorily provided defenses available to it, including laches, estoppel and acquiescence. 15 U.S.C. § 1115(b). If the defendant prevails on one of the permitted defenses, then the plaintiff loses the presumptions of validity, ownership and right to protection. *Ford Motor Co.*, 930 F.2d at 291. Defendant contends that Plaintiff's mark is contestable due to the doctrines of laches and acquiescence and because the mark has no secondary meaning.

### A. LACHES

█ Laches is an equitable doctrine that prevents recovery when a defendant can show (1) inexcusable delay in instituting suit and (2) prejudice to the defendant resulting from such delay. *University of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040, 1044 (3d Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982) (citing *Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1258 (3d Cir.1974)).

The evidence proffered at trial indicates that Plaintiff became aware of Defendant in 1988. Plaintiff's President instructed the Senior Vice President for Lending to contact Defendant about the similar names. When Defendant discovered that Plaintiff's agent had no authority to discuss the matter with

him, Plaintiff's agent promised that a further call, from one with authority, would be forthcoming. However, no call or other communication came for five years. From Defendant's perspective, when Plaintiff never followed-up the 1988 call, Plaintiff had dropped the matter and did not object to Defendant's name. For that reason, Defendant continued on its predetermined course to increase its market share and to become a major player in the Mid–Atlantic region's mortgage industry.

Unbeknownst to Defendant, though, Plaintiff continued to be concerned about the name issue. Plaintiff's Senior Vice–President continued to keep a file of misdirected letters and calls and Plaintiff's own files reflected a regular stream of misdirected letters and telephone calls that gave it notice of what it believed was evidence of confusion in the marketplace. Additionally, in both 1988 and 1990, Plaintiff's Executive Committee and Board of Directors authorized its attorneys to take action about the name issue. However, no action was taken, nor was any follow-up taken by Plaintiff to ensure that its lawyers were protecting its interests. Further, Plaintiff was aware that Defendant was growing in terms of employees, loans closed, offices and other indicia of growth.

█ The question is whether Plaintiff's delay is inexcusable, so we look to Plaintiff's excuse for the delay. First, according to the Senior Vice–President, Plaintiff never took any action because it had more important things to do. Second, Plaintiff argues that its delay is excusable because Defendant's competing activities dramatically increased in 1992 and 1993. The Third Circuit has held that when an alleged infringement changes magnitude, a plaintiff is not guilty of laches if it acts promptly after the nature of the infringement changes. *University of Pittsburgh*, 686 F.2d at 1046. The evidence on this point is that Defendant's closed loans increased in magnitude between 1992 and 1993, as did the number of Defendant's offices and Defendant's employees. Also, De-

---

of § 32 of the Lanham Act. *Standard Terry Mills, Inc. v. Shen Mfg. Co., Inc.*, 803 F.2d 778, 780 n. 4 (3d Cir.1986); *Nugget Distrib. Co-op. v. Mr. Nugget, Inc.*, 776 F.Supp. 1012, 1024 (E.D.Pa.1991).

Accordingly, discussion of federal law will likewise address the state law claim of trademark infringement.

fendant began servicing its loans in 1991, which was a second area of direct competition.

This evidence, however, does not demonstrate such a change in magnitude such that Plaintiff's delay is excused. First, the evidence shows that Plaintiff, as well as other mortgage lenders, also experienced the same type of business surge based on the dramatically low interest rates of those years. Second, the evidence also shows that Defendant's largest increase had actually already occurred by the time the interest rates dropped, and therefore, Plaintiff's late–1993 cease and desist letter still came too late. Third, Defendant only serviced loans in 1991 and had ended that practice two years before the cease and desist letter arrived. Finally, the fact that Plaintiff took internal action about Defendant's name and that it considered Defendant a threat as early as 1988 casts doubt on its change in magnitude theory. Accordingly, we find that Plaintiff's delay was inexcusable.

The next question is whether Plaintiff's delay caused injury to Defendant. Plaintiff's evidence looks to whether Defendant was injured during the time of the delay, and that evidence clearly indicates that Defendant was not. In the circumstances of this case, however, this is the wrong question. The right question is whether Defendant will be injured by the delay if the claim is allowed to proceed now.

Plaintiff contends that prejudice is not shown by mere expenditures for advertising or continuation of infringement. This is correct in some circumstances, however, the cases on this topic may conveniently be grouped in two categories; the first being where the alleged infringer receives unequivocal notice of the plaintiff's objections, yet continues its practices. *See e.g. Imagineering, Inc. v. Van Klassens, Inc.,* 851 F.Supp. 532, 536 (S.D.N.Y.1994), *aff'd and rev'd,* 53 F.3d 1260 (Fed.Cir.), *cert. denied,* — U.S. ——, 116 S.Ct. 277, 133 L.Ed.2d 197 (1995) (plaintiff sent one letter warning of trademark violations as well as a cease and desist letter; thereafter, plaintiff did not see infringements for many years and assumed defendant had complied with cease and desist

letter); *Citibank, N.A. v. Citibanc Group, Inc.,* 724 F.2d 1540, *reh'g denied,* 731 F.2d 891 (11th Cir.1984) (plaintiff sent series of letters objecting to defendant's name, so defendant's continued use not prejudicial); *Tisch Hotels, Inc. v. Americana Inn, Inc.,* 350 F.2d 609, 615 (7th Cir.1965) (defendant continued use after two cease and desist letters). The second group is where the alleged infringer received ambiguous notice and reasonably assumed that any objections were withdrawn. *See e.g. GTE Corp. v. Williams,* 649 F.Supp. 164, 175 (D.Utah 1986), *aff'd,* 904 F.2d 536 (10th Cir.1990), *cert. denied,* 498 U.S. 998, 111 S.Ct. 557, 112 L.Ed.2d 564 (1990) (plaintiff was aware of defendant's use of name and efforts to develop goodwill and recognition for several years, yet took no action).

In the first group, prejudice based on "mere continuation of business" is appropriately not found. However, in the second, prejudice may be found because the alleged infringer would have *reasonably* relied on plaintiff's inaction in continuing its business. *GTE Corp.,* 649 F.Supp. at 175.

Applying the above to the instant facts, it is apparent that Defendant's efforts to increase its name recognition and market status was based, at least in part, on Plaintiff's failure to take any action. Defendant offered, back in 1988, to change its name if Plaintiff would pay for the costs associated with doing so. Defendant reasoned that it was just a start-up company and no real harm would be suffered by changing its name then. Now, however, Defendant is well established, and it proffers evidence that it will be harmed by a name change. Further, Defendant's reliance on Plaintiff's inaction was reasonable because Plaintiff's representative indicated to Defendant that he had no authority to complain on Plaintiff's behalf, but that someone with authority would complain. When no such communication arrived, Defendant reasonably believed that Plaintiff did not actually object to Defendant's name. This state of affairs takes this action out of the group of cases where a defendant's use was seen to be taken at its own risk.

For this reason, we find that Plaintiff's inexcusable delay has prejudiced Defendant.

Accordingly, the doctrine of laches applies and Plaintiff's claims are barred.

### B. ACQUIESCENCE.

■ Defendant also argues that Plaintiff's mark is contestable because Plaintiff acquiesced in Defendant's name. 15 U.S.C. § 1115(b)(8). Plaintiff contends, however, that it did not acquiesce, which requires affirmative conduct by it. J. Thomas McCarthy, *Trademarks and Unfair Competition,* § 31.14 at 585 (2d ed. 1984). In this case, it maintains, Plaintiff notified Defendant in 1988 that it objected to Defendant's name and never gave an indication that it had ceased to object. For this reason, then, Plaintiff declares that it did not acquiesce in Defendant's use.

There is evidence of affirmative acquiescence, however. First, in 1992, Defendant was unable to offer a mortgage to a home-buyer, suggested the home-buyer work with Plaintiff, and in fact, made the initial contacts with Plaintiff for the home-buyer. Plaintiff did, ultimately, make the loan based on Defendant's reference. Second, in 1992, Defendant's President talked with an employee of Plaintiff's at a golf outing about Defendant referring construction loan requests to Plaintiff, and Plaintiff's employee was amenable to that arrangement, although no referrals actually occurred as a result. Third, from the time that Plaintiff first began to receive Defendant's mail and telephone calls, Plaintiff simply forwarded the mail or call to Defendant. At no point did Plaintiff ever indicate in one of its transmittal letters that it viewed the misdirection as evidence of confusion or used that opportunity to request that Defendant change its name. In this way, it can be seen that Plaintiff acquiesced and indeed, aided Defendant's use of the First Keystone name. Accordingly, we also find that Plaintiff acquiesced in Defendant's name.

### C. Secondary Meaning

We have found both that Plaintiff is guilty of laches and that it acquiesced in Defendant's name. For this reason, Plaintiff's mark is contestable, and to prevail on an infringement claim, it must show that its mark has acquired a secondary meaning.

■ Secondary meaning is defined as buyer association, or a buyer's assumption that a product with the mark comes from a particular source. *Blumenfeld Dev. Corp. v. Carnival Cruise Lines, Inc.,* 669 F.Supp. 1297, 1318 (E.D.Pa.1987); *American Diabetes Ass'n v. National Diabetes Ass'n,* 533 F.Supp. 16, 19 (E.D.Pa.1981), *aff'd,* 681 F.2d 804 (3d Cir.1982). Secondary meaning is "generally established through extensive advertising which ... suggests that the products originate from a single source." *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978). A "non-exclusive list of factors which may be considered [to show secondary meaning] includes the extent of sales and advertising leading to buyer association, length of use, exclusivity of use, the fact of copying, customer surveys, customer testimony, the use of the mark in trade journals, the size of the company, the number of sales, the number of customers, and actual confusion." *Ford Motor Co.,* 930 F.2d at 292.

Plaintiff asserts that because it has been using its name for thirteen years, three years more than Defendant, and because it advertises and promotes its mark, that it has shown a regional reputation for its mark. However, no evidence presented at trial actually goes to show the existence of such a regional reputation that it has developed into a secondary meaning. Evidence of actual confusion, discussed at more length below, does not support Plaintiff's assertion that its mark has developed a secondary meaning. For this reason, we find that there is no secondary meaning to Plaintiff's mark, and therefore, that Plaintiff has not shown validity.

### 2. OWNERSHIP

Plaintiff's ownership of its mark is not contested and we found that Plaintiff owned its registration. Therefore, Plaintiff has succeeded on this aspect of the infringement test.

### 3. LIKELIHOOD OF CONFUSION

■ Likelihood of confusion exists when "consumers viewing the mark would

probably assume that the product or service it represents is associated with the source of a different product or service identified by a similar mark." *Fisons Horticulture Inc. v. Vigoro Indus., Inc.,* 30 F.3d 466, 472 (3d Cir.1994) (quoting *Dranoff–Perlstein Assoc. v. Sklar,* 967 F.2d 852, 862 (3d Cir.1992)). Consumers, however, must use at least ordinary caution in making purchasing decisions for their confusion to be actionable. *Id.* at 477. In this Circuit, courts use ten factors to determine whether a certain use infringes upon a registered trademark by causing a likelihood of confusion. *Scott Paper,* 589 F.2d at 1229. These ten factors are:

1. the degree of similarity between the owner's mark and the alleged infringing mark;

2. the strength of the owner's mark;

3. the price of the goods and other factors indicative of the care and intention expected of consumers when making a purchase;

4. the length of time the defendant has used the mark without evidence of actual confusion;

5. the intent of the defendant in adopting the mark;

6. the evidence of actual confusion;

7. whether the goods, though not competing, are marketed through the same channels of trade and advertised through the same media;

8. the extent to which the targets of the parties' sales efforts are the same;

9. the relationship of the goods in the mind of the public because of the similarity;

10. other facts suggesting that the consuming public might expect a prior owner to manufacture a product in the defendant's market.

*Id.* A party need not show every factor to succeed on an infringement claim, nor does every factor weigh the same amount. *Smith Fiberglass Prods. v. Ameron,* 7 F.3d 1327, 1329 (7th Cir.1993); *Lois Sportswear, U.S.A. Inc. v. Levi Strauss & Co.,* 799 F.2d 867, 872 (7th Cir.1986); *American Diabetes Ass'n,* 533 F.Supp. at 20.

### 1. THE DEGREE OF SIMILARITY BETWEEN THE OWNER'S MARK AND THE ALLEGED INFRINGING MARK

We look at each mark in its entirety, giving greater force and effect to its dominant feature. *Estate of Presley v. Russen,* 513 F.Supp. 1339, 1367 (D.N.J.1981); *Country Floors, Inc. v. Partnership Composed of Gepner & Ford,* 930 F.2d 1056, 1065 (3d Cir.1991). Plaintiff charges that the words "First Keystone" are the dominant words in their mark and that "Federal Savings Bank" and "Mortgage" are merely descriptive of the parties' services. *Id.* If that is so, then the dominant portions of the parties' marks are identical. Likewise, when used in their shortened, informal, forms, it is apparent that the parties' names are identical.

However, the evidence demonstrates that in all written or "official" communications, the parties' full names are always used, and in this way the dominant portion of the mark is tempered. In their full form, the names are not identical. It is for that reason that we do not accept Plaintiff's invitation to rule as a matter of law that Defendant's mark infringes Plaintiff's. J. Thomas McCarthy, *Trademarks and Unfair Competition,* § 23.15[1][a] at 23–82 to 23–83 (3d ed. 1995).

Further, the evidence demonstrates that it is common within the financial industry for companies to share portions of their names, such as Federal, Mortgage and First, with other companies. For this reason, the similarity of the parties' names is less remarkable than it might be in other industries.

### 2. THE STRENGTH OF THE OWNER'S MARK

Plaintiff's name is similar to many other businesses around the nation and similar to six other businesses in Pennsylvania. This fact weakens Plaintiff's name and any minor additions or changes to that mark effectively negate any arguably confusing similarity between the two. *Sun Banks of Florida, Inc. v. Sun Federal S & L Ass'n,* 651 F.2d 311, 316, *reh'g denied,* 659 F.2d 1079 (5th Cir.1981); *Ms. World (UK) Ltd. v. Mrs. America Pageants, Inc.,* 856 F.2d 1445, 1449 (9th Cir.1988); *Ocean Bio–Chem, Inc. v. Turner Network Television, Inc.,* 741

F.Supp. 1546, 1556 (S.D.Fla.1990). Further, Plaintiff's name is geographically descriptive, which is a weak type of mark. *New York Style Bagel Chip Co. v. That's Entertainment, Inc.*, 1992 Westlaw 46854 at *12 (E.D.Pa. March 9, 1992).

For these reasons we find that Plaintiff's mark is not particularly strong, meaning that this factor does not weigh in Plaintiff's favor.

### 3. THE PRICE OF THE GOODS AND OTHER FACTORS INDICATIVE OF THE CARE AND INTENTION EXPECTED OF CONSUMERS WHEN MAKING A PURCHASE

 The more important or expensive a product is, the more care the consumer is expected to use in making a purchasing decision. *Versa Prods. Co. v. Bifold Co.*, 50 F.3d 189, 204–05 (3d Cir.1995), *cert. denied*, — U.S. ——, 116 S.Ct. 54, 133 L.Ed.2d 19 (1995); *Fisons*, 30 F.3d at 476 & n. 12. The evidence demonstrates that while mortgage buyers are frequently unsophisticated about the mortgage process, the mortgage itself is a very significant financial transaction for most residential borrowers. For this reason, great care in choosing a mortgagee can be expected. Further, there was no evidence that any consumer actually made a mortgage application or received a mortgage from one company but meant to with the other. Accordingly, this factor weighs in Defendant's favor.

### 4. THE LENGTH OF TIME THE DEFENDANT HAS USED THE MARK WITHOUT EVIDENCE OF ACTUAL CONFUSION

Defendant has used its mark continuously since 1987. One of its branches is referred to as Franklin Mortgage. As discussed more fully below, Plaintiff has presented some hearsay evidence of instances of what it asserts is actual confusion, namely, customers who believed that Defendant was associated with or owned by Plaintiff. Because Defendant has used its name for ten years and because the evidence showing actual confusion is problematic, this factor weighs in neither parties' favor.

### 5. THE INTENT OF THE DEFENDANT IN ADOPTING THE MARK

Plaintiff argues that when a party adopts a mark that is similar to another's mark, it acts at its own peril and doubts are to be resolved against the second user. *Masterpiece of Pa., Inc. v. Consolidated Novelty Co.*, 368 F.Supp. 550, 552 (S.D.N.Y.1973). Plaintiff also maintains that Defendant should have been constructively aware of Plaintiff's mark, and therefore, it intentionally chose a "virtually identical" mark.

 The evidence, however, indicates that Defendant chose its mark innocently. It shows that Defendant was not aware of Plaintiff when it chose its mark, that its mark was actually its second choice, and that Defendant took reasonable precautions in the way of newspaper advertisements and searches with the Secretary of State to determine that its name was acceptable. We find no evidence to support Plaintiff's contention that Defendant's choice was made with less than good faith. This factor, accordingly, weighs in Defendant's favor.

### 6. THE EVIDENCE OF ACTUAL CONFUSION

 The question here is whether Defendant's name is likely to confuse an appreciable number of ordinarily prudent consumers of the type of product in question. *Versa Prods.*, 50 F.3d at 200. Stated otherwise, the Lanham Act seeks to "prevent consumer confusion that enables a seller to pass 'off his goods as the goods of another.'" *Lang v. Retirement Living Pub. Co., Inc.*, 949 F.2d 576, 582 (2d Cir.1991) (quoting *Programmed Tax Sys., Inc. v. Raytheon Co.*, 439 F.Supp. 1128 (S.D.N.Y.1977)). Generalized confusion is not what courts look to, but rather, evidence of confusion in mistaken purchasing decisions. *Lang*, 949 F.2d at 582–83; *Sports Authority, Inc. v. Prime Hospitality. Corp.*, 877 F.Supp. 124, 129 (S.D.N.Y.1995); *United States Blind Stitch Mach. Corp. v. Union Special Mach. Co.*, 287 F.Supp. 468, 471 (S.D.N.Y.1968). Both pre- and post-sale confusion can be relevant to this inquiry. *Lois Sportswear*, 799 F.2d at 872.

■■■ There is no evidence that any consumer mistook Defendant for Plaintiff in making a mortgage application, or in actually receiving a mortgage. The only evidence on this subject, showing consumers calling Plaintiff in search of Defendant's rates, does not show confusion in this sense. *Smith Fiberglass Prods., Inc. v. Ameron, Inc.,* 7 F.3d 1327 (7th Cir.1993). In *Lang,* there was evidence that some consumers had called to ask whether plaintiff and defendant were affiliated. The Court held that such evidence did not demonstrate that confusion led to any effect on the consumers' purchasing decisions. 949 F.2d at 583. Indeed, Professor McCarthy contends that inquiries of affiliation, standing alone, are insufficient proof of confusion because they reveal the "less than totally 'confused' state of mind of the enquiring persons." McCarthy, § 23.02[2][d] at 23–39. Moreover, Plaintiff did not show that the misplaced calls or mail were the result of confusion between the two companies as opposed to mere carelessness or accident. *Nutri/System, Inc. v. Con–Stan Indus., Inc.,* 809 F.2d 601, 606–07 (9th Cir.1987).

Because Plaintiff has not shown that there is actual confusion in the marketplace that confused consumers about the source of their mortgages, we find that this factor weighs in Defendant's favor.

### 7. WHETHER THE GOODS, THOUGH NOT COMPETING, ARE MARKETED THROUGH THE SAME CHANNELS OF TRADE AND ADVERTISED THROUGH THE SAME MEDIA

Both parties advertise and promote in the same publications, trade fairs and the like. Both parties also target the same people as referral sources, namely realtors, appraisers and title agencies and resell their loans to Freddie Mac. Finally, both parties' end goal, at least in part, is to reach the same customer base, that of the first residential mortgagor in Delaware and Chester Counties. For this reason, this factor weighs in Plaintiff's favor.

### 8. THE EXTENT TO WHICH THE TARGETS OF THE PARTIES' SALES EFFORTS ARE THE SAME

The evidence indicates that the parties directly compete in one area; the provision of first residential mortgages in the Delaware and Chester County areas. Apart from that, the parties each offer mortgage products that the other does not, and a significant amount of Defendant's business comes from geographical areas that Plaintiff does not significantly compete in. In the area where the parties do compete, however, their competition is direct and they offer almost identical products.

■■■ If a plaintiff's mark is strong in only one area, it is not necessarily entitled to protection in other areas. *ACCU Personnel, Inc. v. AccuStaff, Inc.,* 846 F.Supp. 1191, 1206 (D.Del.1994). So at the most, Plaintiff would only be entitled to mark protection in the Delaware and Chester County areas. Because there is direct competition in at least one area of the parties' products, but because that competition is geographically limited in scope, we find that this factor is balanced between the two parties.

### 9. THE RELATIONSHIP OF THE GOODS IN THE MIND OF THE PUBLIC BECAUSE OF THE SIMILARITY

There is some hearsay evidence that some customers of Plaintiff's believed that Defendant was associated with Plaintiff. If we look to this evidence, not for its truth, but for the state of mind of Plaintiff's customers, this can show a relationship of goods. Plaintiff did not, however, present any other evidence to support this point, such as customer surveys.

We find that the evidence does not indicate that the relationship of the parties' services is linked in the public's mind, and therefore, this factor weighs against Plaintiff.

### 10. SUMMARY OF SCOTT FACTORS

■■■ The above analysis demonstrates that by far, the factors weigh in favor of Defendant. Two factors are balanced between the parties. The only factor in Plaintiff's favor is the channels of trade point. The facts presented on this point, while important, are not enough to outweigh the evidence indicating that Defendant has not infringed Plaintiff's mark. Accordingly, we find that Plaintiff's claims for violations of 15

U.S.C. § 1114 and for common law trademark infringement, fail.

## II. Claims Under 15 U.S.C. § 1125 and Common Law Torts of Unfair Competition and False Designation of Origin

 Section 43(a) of the Lanham Act[2] creates civil liability for any person who:

in connection with any goods or services, ... uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person.

15 U.S.C. § 1125(a). Accordingly, to succeed on these claims, Plaintiff must show that Defendant (1) uses a designation, (2) in interstate commerce, (3) in connection with goods, (4) which designation is likely to cause confusion, mistake, or deception as to (5) the origin, sponsorship, or approval of Defendant's goods, and (6) Plaintiff has been or is likely to be damaged by these acts.

Plaintiff contends that it has made such a showing, and therefore, demands relief. Based in part on the findings above, we cannot agree. First, there has been no showing that Defendant's designation is likely to cause confusion, mistake, or deception as to the origin, sponsorship or approval of its goods. Second, the only possible evidence of prejudice to Plaintiff is Plaintiff's testimony that its good will can be affected when Defendant's erroneous and negative reports to HUD are released because consumers may mistake Defendant's reports for Plaintiff's. As above, because the likelihood of confusion has not been shown, the likelihood of prejudice arising from such confusion is

equally unproven. Accordingly, these claims must fail.

## CONCLUSIONS OF LAW

1. Plaintiff has failed to demonstrate that Defendant violated 15 U.S.C. § 1114 and state common law torts of trademark infringement.

2. Plaintiff has failed to demonstrate the Defendant violated 15 U.S.C. § 1125(a) and state common law torts of unfair competition and false designation of origin.

3. Plaintiff has failed to show that an injunction is appropriately awarded.

4. A verdict and judgment in Defendant's favor are appropriate.

An appropriate Order follows.

## ORDER

AND NOW, this 25th day of April, 1996, following a non-jury trial in this matter and careful consideration of the parties' proposed findings of fact and conclusions of law, and for the reasons set forth in the preceding Decision, it is hereby ORDERED that Verdict and Judgment are hereby entered in favor of Defendant on all Counts in Plaintiff's Complaint.

---

**2.** Pennsylvania's common law tort of unfair competition has the same standard as § 43(a). *Institute for Scientific Info. v. Gordon and Breach,* 743 F.Supp. 369, 373 (E.D.Pa.1990), *vacated on other* grounds, 931 F.2d 1002 (3d Cir.), *cert. denied,* 502 U.S. 909, 112 S.Ct. 302, 116 L.Ed.2d 245 (1991). Accordingly, the following discussion addresses both federal and state claims.